**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**BRYAN CHRISTOPHER STURM,**

      **Petitioner,**                 **CASE NO. 2:10-CV-00247**
                                     **JUDGE GRAHAM**
**v.**                             **MAGISTRATE JUDGE ABEL**

**JAMES DARNELL, Acting Superintendent,**

      **Respondent.**

### REPORT AND RECOMMENDATION

Petitioner Bryan Christopher Sturm, a state prisoner, brings this action for a writ of habeas corpus under 28 U.S.C. § 2254. This matter is before the Magistrate Judge on the petition, Respondent's return of writ, Petitioner's traverse, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

### FACTS and PROCEDURAL HISTORY

On November 22, 2004, Petitioner Bryan Christopher Sturm's grandmother and aunt were shot to death. Sturm, then twelve years old, was interrogated by investigating officers. After initially denying any involvement in the deaths, Sturm confessed to discharging a shotgun three times, causing their deaths, and then fleeing the scene. The petition alleges that Sturm was denied his right against self-incrimination, he was denied his right to the effective assistance of counsel, and he was denied due process of law when the trial court imposed a sentence greater than the maximum term authorized by the jury's verdict.

The Ohio Fourth District Court of Appeals summarized the facts and procedural history of this case as follows:

> The State of Ohio filed a complaint against Sturm alleging him to be
> delinquent of two counts of aggravated murder with firearm

specifications. The complaint stemmed from a double homicide at the home of Sturm's grandmother, Nancy Tidd. The victims, Nancy Tidd and Emma Tidd (Sturm's aunt), were both found sitting in the living room with gunshot wounds to the head. Autopsy results revealed that in addition to the gunshot wound, Nancy Tidd had a large laceration on the top left side of her head. Police believe this injury was caused by the butt end of the .410 shotgun that was used during the commission of the homicides.

The investigation initially focused on Nancy Tidd's live-in boyfriend, Frank Russell. Detectives placed Russell in an unmarked car at the scene and questioned him about the murders. However, Russell explained that he left for work that day at around 2:45 p.m. He stated he received a call at 4:30 p.m. from Nancy, who informed him that Sturm was at the home. Nancy also told Russell that she believed Sturm had been "huffing" gasoline because she could smell it, but that he seemed "alright." Russell stated that he called home throughout the evening to check on Nancy, as he normally does, but no one answered the phone. Just before 9:00 p.m. Russell stated that he had become worried and told his foreman that he needed to leave work. Following this explanation, Russell ceased being a suspect and the detectives permitted him to go into the residence. Once inside, Russell pointed out that the hinges had been removed from the gun cabinet.

Detective Warden arrived at the crime scene and received a briefing. He learned that the victims were in a relaxed state when shot and that it appeared a .410 shotgun had been used in the commission of the crime. Another officer, Detective Kapple, suggested they locate Sturm because of the report that he "huffed" gasoline. Detective Warden was to locate and interview Sturm.

As the investigators were preparing to leave, another detective approached and informed them that a caller named Rodney West had provided additional information. West had reported that as he was driving home earlier that evening, he picked up a boy walking along State Route 530. The boy told West his name was Chris Sturm and he asked for a ride to Lower Salem. West stated the boy was wearing jeans and shoes, but no shirt, hat or gloves. West drove the boy to Lower Salem and dropped him off at an old abandoned store with apartments above it, where the boy said he lived. Later that evening, upon learning that two women had been shot and that police were looking for the grandson, Chris Sturm, West called the Sheriff's department and relayed the information he had. In light of this new

report, the detectives first went to interview West at his residence and then proceeded to Sturm's home.

At 11:35 p.m. the detectives arrived at Sturm's home in an unmarked car, accompanied by a marked cruiser. Detective Warden initially spoke with Sturm's father and informed him of the homicides and asked to speak with Sturm. Detective Warden and Sturm's father were acquainted, having grown up together. Sturm's father gave Detective Warden permission to speak with Sturm but asked to be present. After Warden agreed, Sturm's father introduced Warden as a detective with the Sheriff's office and they all proceeded to the unmarked cruiser. Detective Warden was seated in the front driver's side; Sturm was seated in the front passenger side; Sturm's father was seated in the backseat behind Sturm; and another officer was seated in the back seat behind Detective Warden.

Detective Warden told Sturm, in his father's presence, that he was not under arrest, did not have to speak with them, and that he could leave at any time. Sturm responded that he understood. Detective Warden initially began questioning Sturm by asking him what he had done that day. Sturm responded with a narrative, making some statements that Detective Warden knew were false. Sturm told Detective Warden that he woke up around 1:00 p.m. that day, got dressed and started to walk to school, but decided not to go. Instead, he went back home and "huffed" gasoline for half an hour to an hour. Then, his stepbrother Matt gave him a ride to his grandmother's house, where he fell asleep until around 3:20 p.m. Sturm stated that when he woke up, he asked and received permission from his grandmother to take the .410 shotgun in the backyard to target practice. Sturm stated he took the gun into the backyard, fired two shots at a beer can, went back inside and got into an argument with his grandmother. Sturm stated he put the gun back in the corner and called his uncle, Brad Russell, for a ride home. Sturm stated that when he got home, he took a shower, washed his jeans and watched television.

Detective Warden then asked a series of follow-up questions; based upon Sturm's responses, Detective Warden was convinced Sturm was not telling the truth. Specifically, Detective Warden knew that Sturm had gotten a ride home with Rodney West, not Brad Russell. At that point, Detective Warden asked Sturm's father to exit the vehicle so he could speak with him. Outside the vehicle, Detective Warden told Sturm's father that he knew Sturm was lying and told him about the information they had received from Rodney West. Sturm's father was upset and asked Detective Warden if he should get an attorney.

Detective Warden did not answer the father's question, but instead responded that he needed to know the truth. In response, Sturm's father said "Mark, you go ahead and talk to him, but be good to him." Sturm's father then walked towards the house and Detective Warden got back into the vehicle.

When Detective Warden re-entered the vehicle, he asked Sturm again about his ride home from his grandmother's house, giving Sturm an opportunity to tell the truth. However, Sturm again stated that his uncle, Brad Russell gave him a ride home. Detective Warden told Sturm that he was lying and that Rodney West had picked him up and given him a ride home. He then asked Sturm, "Is it a possibility that the weapon could have accidentally gone off, striking your aunt and your grandmother?" Again, Sturm denied this suggestion.

Detective Warden then asked Sturm "What's the biggest thing that you're afraid of right now in this situation?" Sturm responded that "I just don't want my mother and father to know what I have done." At that point, Sturm stated that he shot his aunt accidentally and shot his grandmother because she had been "putting him down."

Sturm then went into a more detailed explanation, stating that his grandmother had given him permission to take the weapon out. When he came back in, his grandmother started putting him down. Sturm stated that he pulled the weapon up to shoot his grandmother and his aunt Emma reached out and grabbed the weapon. Sturm stated that when he went to fire, he accidentally struck his aunt Emma in the side of the head. Sturm then stated that he accidentally discharged the weapon into the wall behind his grandmother, but then reloaded the gun and shot his grandmother in the side of the neck. He then stated that he kicked the shells into the kitchen, put the gun in the laundry room and exited out the back of the residence into the woods. When he started to "sober up," he puked. His shirt had burrs in it so he took his shirt off and threw it down. West picked him up and gave him a ride home. When he got there, he washed his jeans and took a shower. After Detective Warden inquired about the reason for doing this, Sturm said that he was trying to get rid of any gunshot residue.

At that point, Detective Warden read Sturm his *Miranda* rights and after obtaining a written waiver, he tape recorded Sturm's statement. After Warden turned the tape on, the following conversation began:

"MW: Ok. (unintelligible) okay, the time now is 12:19 a.m. Uhh, I am sitting here talking to Chris Sturm. Chris, prior to talking to you I informed you that, first that you were not under arrest, didn't I?

CS: Uh, huh.

MW: I also informed you that you could leave at any time. Correct?

CS:(unintelligible)


MW: Ok. Uhh, you had, you just told me that you were involved with the murder of your grandma and Aunt.

CS: Yea."

Sturm essentially repeated the earlier version of events. After taping the statement, Detective Warden informed Sturm's father that Sturm had confessed. Then Sturm was permitted to see his father. The detectives took various photographs, seized several items from the residence, walked Sturm back down to the unmarked cruiser and, according to Detective Warden, took him into custody.

Based upon a complaint alleging Bryan Christopher Sturm was delinquent by virtue of two counts of aggravated murder with firearm specifications, the juvenile court conducted a detention hearing the same day. The court ordered Sturm to remain in detention pending further hearings. The State of Ohio filed a Notice of Intent to Pursue a Serious Youthful Offender Status, and the grand jury subsequently indicted Sturm on two counts of aggravated murder, each with a firearm specification. Sturm denied all counts contained in the indictment. The court set bond at one million dollars and denied Sturm's request to be released into the general population at the Washington County Juvenile Center.

Sturm's counsel filed multiple pre-trial motions, including a motion to suppress. After the court denied Sturm's motion, the matter proceeded to trial where the State introduced Sturm's statements and many of the facts mentioned above.

In its verdict, the jury found Sturm delinquent of two counts of murder, along with each firearm specification. The court imposed a "blended sentence": the traditional juvenile disposition, committing

Sturm to the Department of Youth Services until age twenty-one and two consecutive terms of fifteen years to life in an adult prison for each count of murder. The court stayed the adult portion of the sentence pending successful completion of the juvenile disposition.

*In re Sturm,* 2006 WL 3861074, at *2-5 (Ohio App. 4th Dist. Dec. 22, 2006). Petitioner filed a

timely appeal in which he raised the following assignments of error:

I. THE JUVENILE COURT ERRED WHEN IT DENIED BRYAN CHRISTOPHER STURM'S MOTION TO SUPPRESS THE STATEMENTS HE MADE DURING A CUSTODIAL INTERROGATION BECAUSE THOSE STATEMENTS WERE ELICITED IN VIOLATION OF HIS CONSTITUTION (SIC) RIGHT AGAINST SELF-INCRIMINATION.

II. THE TRIAL COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION WHEN IT ADJUDICATED HIM DELINQUENT OF TWO COUNTS OF MURDER WITH GUN SPECIFICATIONS WHEN THAT FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

III. THE JUVENILE COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS BY ADMITTING CHARACTER EVIDENCE IN VIOLATION OF OHIO RULES OF EVIDENCE 401, 402, 403, AND 404, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

IV. THE JUVENILE COURT VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT TO DUE PROCESS BY ADMITTING HEARSAY EVIDENCE IN VIOLATION OF OHIO RULES OF EVIDENCE 801 AND 802, THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

V. THE JUVENILE COURT ABUSED ITS DISCRETION WHEN IT FOUND THAT THERE WAS A NECESSITY FOR A SERIOUS

YOUTHFUL OFFENDER DISPOSITIONAL SENTENCE UPON BRYAN CHRISTOPHER STURM.

VI. THE TRIAL COURT ERRED IN SENTENCING BRYAN CHRISTOPHER STURM TO CONSECUTIVE TERMS IN AN ADULT PRISON THEREBY DENYING HIM DUE PROCESS AS PROVIDED FOR BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

VII. BRYAN CHRISTOPHER STURM WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTIONS 10 AND 16 OF THE OHIO CONSTITUTION.

VIII. THE TRIAL COURT ERRED WHEN IT IMPOSED A TERM OF INCARCERATION THAT EXCEEDED THE MINIMUM TERM OF INCARCERATION. THE SERIOUS YOUTHFUL OFFENDER SENTENCE WAS IMPROPERLY BASED ON FACTS THAT WERE NOT FOUND BY THE JURY, IN CONTRAVENTION OF BLAKELY V. WASHINGTON (2004), 542 U.S. 296.

IX. WASHINGTON COUNTY'S JUVENILE COURT AND DETENTION FACILITY AND OHIO'S SERIOUS YOUTHFUL OFFENDER DISPOSITIONAL SENTENCING SCHEME, R.C. 2152.021, R.C. 2152.11, R.C. 2152.13, AND R.C. 2152.14, VIOLATES A JUVENILE'S RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT AND VIOLATED BRYAN CHRISTOPHER STURM'S RIGHT AGAINST CRUEL AND UNUSUAL PUNISHMENT AS APPLIED AS GUARANTEED BY THE EIGHTH AND FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE I, SECTION 9 OF THE OHIO CONSTITUTION.

X. OHIO'S SERIOUS YOUTHFUL OFFENDER LAW, R.C.2152.021, R.C. 2152. 11, R.C. 2152.13 AND R.C.2152.14 VIOLATES A JUVENILE'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE FIFTH AND FOURTEENTH

AMENDMENTS TO THE UNITED STATES CONSTITUTION
AND ARTICLE I, SECTION 16 OF THE OHIO CONSTITUTION.

*See id.* at \*5-6.  On December 22, 2006, the appellate court affirmed the judgment of the trial court.

*Id.*  Petitioner filed a timely appeal.  On May 16, 2007, the Ohio Supreme Court accepted the appeal

on Petitioner's first proposition of law, and held the case pending a decision in *State v. D.H.*  *In re*

*Sturm*, 113 Ohio St.3d 1511 (2007).  On March 17, 2009, the Ohio Supreme Court affirmed the

judgment of the state appellate court.  *In re Sturm*, 121 Ohio St.3d 268 (2009).

Petitioner also pursued post conviction relief.

> Sturm filed a timely petition with the trial court for postconviction relief under R.C. 2953.21. Sturm raised six claims for relief: (1) ineffective assistance of counsel due to trial counsel's failure to obtain funds to secure an expert in false/coerced confessions; (2) ineffective assistance of counsel due to trial counsel's failure to obtain funds to secure a ballistic expert; (3) ineffective assistance of counsel due to trial counsel's failure to obtain funds to secure a crime scene reconstruction expert; (4) ineffective assistance of counsel due to trial counsel's failure to obtain funds to secure a DNA expert; (5) the state violated his due process rights because it presented false and/or materially misleading evidence concerning the physical evidence found at the crime scene by contending that the evidence was consistent with its theory of guilt; and (6) the trial court violated his rights to trial by jury and equal protection when it made the findings for the serious youthful offender disposition, as required by R.C. 2152.13.

> In support of his petition, Sturm submitted reports from John R. Nixon and Gary A. Rini; the affidavit of Deborah Davis, Ph.D.; a letter from Julie A. Heinig, Ph.D.; the affidavit of Raymond Smith, Sturm's trial counsel; the affidavits of two jurors; and the affidavit of Kelly Heiby, an investigator with the Office of the Ohio Public Defender.

> After the trial court dismissed Sturm's petition without holding an evidentiary hearing, Sturm filed this appeal.

> II. Assignment of Error

> The trial court erred when it denied Bryan Christopher Sturm's
> ("Chris") petition for post-conviction relief, and did so without a
> hearing, because Chris had established that he was deprived of his
> right to the effective assistance of counsel, equal protection, and a
> fair trial, as guaranteed by the Fifth, Sixth, and Fourteenth
> Amendments to the United States Constitution, and Section 2, 10, and
> 16, Article I and Section 39, Article II of the Ohio Constitution.
> (A-73-107; Decision and Order Filed November 15, 2007).

*In re B.C.S.*, 2008 WL 4823572, at *1-2 (Ohio App. 4th Dist. Oct. 29, 2008). On October 29, 2008,

the appellate court affirmed the judgment of the trial court. *Id.* On March 29, 2009, the Ohio

Supreme Court dismissed Petitioner's subsequent appeal. *In re B.C.S.*, 121 Ohio St.3d 1427 (2009).

On March 24, 2010, Petitioner filed the instant petition for a writ of habeas corpus pursuant

to 28 U.S.C. § 2254. He alleges that he is in the custody of the Respondent in violation of the

Constitution of the United States based upon the following grounds:

> 1. Petitioner was denied his right against self-incrimination, in
> violation of the Fifth and Fourteenth Amendments to the United
> States Constitution.
>
> 2. Petitioner was denied his right to the effective assistance of trial
> counsel in violation of the Sixth and Fourteenth Amendments to the
> United States Constitution.
>
> 3. Petitioner was denied due process of law and trial by jury because
> the trial court made certain mandatory statutory findings before
> imposing a sentence greater than the maximum term authorized by
> the jury verdict, in violation of the Sixth and Fourteenth Amendments
> to the United States Constitution.

It is the position of the Respondent that Petitioner's claims are without merit.

## CLAIM ONE

In his first claim for relief, Petitioner asserts that he was denied his right against self-

incrimination. The state appellate court rejected this claim as follows:

Sturm asserts that the juvenile court should have suppressed his statements to Detective Warden because they occurred during custodial interrogation and in the absence of *Miranda* warnings in violation of his constitutional right against self incrimination.

Appellate review of a trial court's decision regarding a motion to suppress evidence involves mixed questions of law and fact. *State v. Long (*1998), 127 Ohio App.3d 328, 332, 713 N.E.2d 1, 3. In a motion to suppress, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 1996-Ohio-134, 661 N.E.2d 1030. Accordingly, we are bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Landrum* (2000), 137 Ohio App.3d 718, 722, 739 N.E.2d 1159. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard. *Ornelas v. United States* (1996), 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911; *Landrum, supra*.

In support of his assertion that the juvenile court should have granted his motion to suppress, Sturm argues that he was in custody when he was questioned, that he was subjected to a custodial interrogation before he was advised of his *Miranda* rights, and that he did not knowingly, voluntarily, and intelligently waive his *Miranda* rights. He also contends his confession to the Washington County Sheriff's Detective was so unreliable that it should not have been admitted into evidence. The State disagrees, arguing because Sturm was not in custody during the questioning, the officers were not required to read him the *Miranda* warning.

A. Custody

The primary issue under this assignment of error is whether Sturm was subjected to custodial interrogation. *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602; *see, also, Stansbury v. California* (1994), 511 U.S. 318, 114 S.Ct. 1526, and *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711. In *Oregon v. Mathiason*, the court stated that the *Miranda* protection attaches only where there has been such a restriction on a person's freedom as to render him in "custody."

The question of whether an individual is "in custody" is a mixed question of law and fact entitled to independent review. *See Thompson v. Keohane* (1995), 516 U.S. 99, 116 S.Ct. 457. In deciding whether the individual was in custody, the reviewing court focuses on "the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned." *Stansbury*, 511 U.S. at 320; *see, also*, *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138 (stating that the relevant inquiry is how a reasonable person in the individual's position would have understood the situation). *See, also, State v.. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, ¶ 14 (stating the "only relevant inquiry"... is "how a reasonable man in the suspects position would have understood his situation.").

The reviewing court must examine all of the circumstances surrounding the interrogation, but "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest ." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517 (quoting *Oregon v. Mathiason*). "[T]he mere fact that an investigation has focused on a suspect does not trigger the need for *Miranda* warnings in noncustodial settings." *Minnesota v. Murphy* (1984), 465 U.S. 420, 431, 104 S.Ct. 1136, 1144, citing *Beckworth v. U.S.* (1976), 425 U.S. 341, 96 S.Ct. 1612.

The trial court found the following facts in support of its conclusion that Sturm was not in custody when he was interviewed by Detective Warden. First, the officers interviewed Sturm in an unmarked police car in front of Sturm's residence. This vehicle was indistinguishable from a regular passenger vehicle, except for the presence of a small police radio, which was not turned on during the interview. Also, the entire passenger compartment of the vehicle was open and all four doors on the vehicle had working door handles. Second, the officers obtained permission from Sturm's father before questioning Sturm. Third, Sturm's father sat in the unmarked car with him for the first portion of the interview. Fourth, before any questioning began, Detective Warden told Sturm that he was not under arrest, that he was free to leave at any time, and that he did not have to speak with the officers. Sturm responded that he understood.

Based on these findings, which are supported by the record, the trial court did not err in concluding that Sturm was not in custody at the time of the questioning.

In *State v. Boyd*, Washington App. 02CA744, 2003-Ohio-983, unreported, at paragraph 9, we stated:

> [w]hen determining whether a custodial interrogation has occurred, the relevant inquiry is whether a reasonable person in the defendant's position would have believed, under the totality of the circumstances, that he was not free to leave. *Berkemer v. McCarty* (1984), 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317. When reviewing the totality of the circumstances, courts should consider, the "age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement." *State v.. Slagle* (1992), 65 Ohio St.3d 597, 600, 605 N.E.2d 916. *See, also, State v. Barker* (1978), 53 Ohio St.2d 135, 372 N.E.2d 1324, paragraph two of the syllabus.

When viewing the totality of the circumstances, a reasonable juvenile in Sturm's position would not have believed that he or she was in custody at the time of the interview. Although Sturm was young, he had prior experience with police questioning. Officers from the Washington County Sheriff's Office had questioned Sturm about an allegation of sexual misconduct only a few weeks before this incident. Furthermore, Sturm's high school teacher testified at the suppression hearing that, in her opinion, Sturm has a "high IQ" and would have been able to understand the officers when they told him that he was not under arrest, that he did not have to answer their questions, and that he was free to leave at any time. Therefore, despite his young age, the record indicates that Sturm possessed a high enough level of intelligence and maturity to understand the officers. His recent prior experience with the sheriff's office bolsters that conclusion.

The record indicates that the interview took place in two separate sessions: one with Sturm's father present, and one without him. However, each of these sessions were of relatively short duration, and there is no evidence from the record that would describe the interviews as harsh or intense. Additionally, there is no evidence that Sturm suffered from any physical deprivation or mistreatment during the questioning, nor was he threatened or induced to confess.

When viewing the totality of the circumstances, a reasonable juvenile in Sturm's position would not have believed that he or she was in custody at the time of the interview. Based on our review of the record, we conclude that Sturm was not in custody during his questioning inside an unmarked police car. Because Sturm was not in custody, Detective Warden was not required to advise him of his *Miranda* warnings. Accordingly, we do not need to address whether Sturm knowingly and voluntarily waived his *Miranda* rights during the second investigation because this issue is now moot.

B. Subjective Intention

Sturm also contends that Detective Warden should have been required to answer a question posed to him by Sturm's counsel at the suppression hearing, i.e. what would Warden have done if Sturm had exited the car and run away? At the hearing, the State objected to the question as speculative, and the court sustained the objection.

By posing this question at the suppression hearing, Sturm's counsel apparently sought to learn whether the officer thought Sturm was in custody. We have repeatedly held that, "[t]he subjective views of the interviewing officer and the suspect are immaterial to the determination of whether law enforcement conducts a custodial interrogation." *Boyd,* Washington App. No. 02CA744, 2003-Ohio-983, at paragraph 9, citing *Stansbury v. California* (1994), 511 U.S. 318, 323, 114 S.Ct. 1526. The test is objective as we stated above. Therefore, Detective Warden's subjective view of the situation was not relevant to the inquiry. Since the answer to the question was irrelevant, the court properly prohibited the answer.

C. Reliability

Sturm further contends that his statement should be suppressed because some factual inconsistencies between the confession and the evidence gathered at the crime scene render the confession unreliable. He also argues that the interrogation techniques used by the officers were geared towards adults rather than juveniles. We reject these contentions based upon the lack of citation to authority and the non-coercive nature of the interview as indicated by the record.

In Sturm's confession, he stated that he shot his aunt "accidentally" after he struggled with her for control of the shotgun. However, the crime scene clearly showed that no struggle took place. In fact, the notion of an "accidental" shooting had first been advanced by

Detective Warden when he suggested to Sturm that the shooting might have been an accident. Sturm apparently accepted this explanation to minimize his culpability in the shooting. This admission placed Sturm in the home at the time of the deaths, holding the weapon that inflicted the fatal shots. Sturm then admitted that after shooting his aunt, he intentionally shot and killed his grandmother, and he described how he committed the offense.

Normally, unreliability is related to voluntariness and becomes an issue where coercion is involved. There is no evidence of any coercion in this record, including the interrogation techniques. Simply because Sturm's confession does not exactly mirror the evidence, does not render it unreliable. In his admission, Sturm attempted to minimize his culpability in the crimes by claiming they were accidental. The minor factual inconsistencies between Sturm's confession and the evidence found at the crime scene do not render his confession inadmissible. Therefore, we overrule Sturm's first assignment of error.

*In re Sturm,* 2006 WL 3861074, at *6-9.

The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) provides:

In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable determination of the facts in light of the evidence that was presented. 28 U.S.C. § 2254(d) provides:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an

14

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable . . . an unreasonable application is different from an incorrect one." *Bell v. Cone,* 535 U.S. at 694. To obtain habeas corpus relief, Petitioner must show the state court's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Bobby v. Dixon,* – S.Ct. –, 2011 WL 5299458, at *1 (Nov. 7, 2011)(quoting *Harrington v. Richter,* 562 U.S. ——, ——, 131 S.Ct. 770, 786–87 (2011).

Moreover, and as discussed by the United States District Court for the Northern District of Ohio,

[i]n the habeas context, the determination of whether a person is "in custody," and therefore entitled to *Miranda* warnings, is a mixed question of law and fact. *Thompson, 516 U.S. at 102.* The first inquiry, as to the circumstances surrounding the interrogation, is a factual finding entitled to a presumption of correctness under 28 *U.S.C. § 2254(d). Id. at 112.* The second inquiry, however, calls for the application of the controlling legal standard, and therefore is subject to independent habeas review. *Id. at 112–113.*

*Bishop v. Hudson,* No. 1:08-CV-2764, 2010 WL 703083, at *11 (N.D. Ohio Feb. 22, 2010). With these standards in mind, the Magistrate Judge turns to the merits of Petitioner's claim.

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." The privilege against self-incrimination prohibits the government from using any statement against a criminal defendant "stemming from custodial interrogation of

the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. at 444. The Supreme Court defined "custodial interrogation" in *Miranda* to be "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* Under these circumstances, the person being questioned must be warned he has the right to remain silent, any statement he makes may be used as evidence against him, and he has the right to the presence of an attorney, either retained or appointed. *Id.* Police officers are not required to administer *Miranda* warnings, however, where there has been no restriction on a person's freedom such that he is "in custody." *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

> In determining whether an individual was in custody, a court must examine all of the circumstances surrounding the interrogation, but 'the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."

*Stansbury v. California*, 511 U.S. 318, 322 (1994)(citing *California v. Beheler*, 463 U.S. 1121, 1125)(*per curiam*)(quoting *Mathiason*, 429 U.S. at 495)). This is an objective determination and does not depend on subjective views of interrogating officers or the person being questioned. *Id.* at 323. "[C]ustody must be determined based on how a reasonable person in the suspect's situation would perceive his circumstances." *Yarborough v. Alvarado*, 541 U.S. at 662 (2004)(citing *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

> Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave. Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry:

> was there a formal arrest or restraint on freedom of movement of the
> degree associated with a formal arrest.

*Yarborough v. Alvarado,* 541 U.S. at 663 (quoting *Thompson v. Keohane*, 516 U.S. at 112).

Petitioner refers to *J.D.B. v. North Carolina*, – U.S. –, 131 S.Ct. 2394 (2011), *see Notice of Supplemental Authority*, Doc. 13, in support of his argument that the state appellate court incorrectly concluded that he, as twelve year old, was not "in custody" as defined under *Miranda.* In *J.D.B.*, decided after the state appellate court's decision here, the United States Supreme Court held, "a child's age properly informs the *Miranda* custody analysis." *Id.* at 2399. In *J.D.B.* uniformed police removed a thirteen-year-old child suspected of a series of home break-ins from his classroom during school and escorted him to a closed conference room where they questioned him in the presence of two school administrators. J.D.B. denied involvement in the crimes, but then confessed when police threatened to place him in a juvenile detention center. *Id*. at 2399-2400. After J.D.B. confessed, police advised him he was free to leave and did not have to answer any questions. *Id*. J.D.B. ultimately provided a written statement regarding his involvement in the crimes. He was released to go home at the end of the school day, and charges subsequently were filed. *Id*. at 2400. Police questioned J.D.B. for approximately thirty to forty-five minutes. *Id.* at 2399. He was not given the opportunity to speak with his grandmother prior to questioning. *Id*. The Supreme Court remanded the case to the state trial court for re-consideration of whether J.D.B. was in custody such that *Miranda* warnings were required prior to questioning, taking into consideration J.D.B.'s age. In doing so, the Supreme Court noted, "children 'generally are less mature and responsible than adults,'" and "'often lack the experience, perspective, and judgment to recognize and avoid choices that could be detrimental to them'. . . and 'are more vulnerable or susceptible to. . . outside pressures' than adults.'" *J.D.B.*, 131 S.Ct. at 2403 (citations omitted).

> [E]vents that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens." *Haley v. Ohio,* 332 U.S. 596, 599, 68 S.Ct. 302, 92 L.Ed. 224 (1948) (plurality opinion); see also *Gallegos v. Colorado,* 370 U.S. 49, 54, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962) ("[N]o matter how sophisticated," a juvenile subject of police interrogation "cannot be compared" to an adult subject). Describing no one child in particular, these observations restate what "any parent knows"—indeed, what any person knows—about children generally. *Roper,* 543 U.S., at 569, 125 S.Ct. 1183.

*Id*. (footnote omitted). The Supreme Court, however, also stated a child's age would not necessarily be a "determinative, or even a significant, factor in every case. . . . It is, however, a reality that courts cannot simply ignore." *Id*. at 2406. The Court reiterated that consideration of a juvenile's age, when known or objectively apparent to a reasonable police officer, remained an objective, rather than subjective, determination. *Id*.

The parties have not addressed the issue of whether *J.D.B.*, decided on June 11, 2011, and long after the Ohio Supreme Court dismissed Petitioner's appeals, constitutes "clearly established federal law" applicable to review of Petitioner's claim. In *Bobby v. Dixon*, 2011 WL 5299458, at *4, n.3, the Supreme Court noted it was an "open question" whether *Missouri v. Seibert*, 542 U.S. 600 (2004)(addressing whether the "question first and warn later" technique provides a constitutionally admissible confession under *Miranda*), applied to its review, where *Seibert* was decided after the Ohio Supreme Court's opinion in the case, but before the United States Supreme Court denied the petition for *certiorari. See id.* The Supreme Court declined to address the issue, concluding in any event, that *Seibert* was "entirely consistent with the Ohio Supreme Court's decision" in *Dixon*. *Id*.

In *Smith v. Spisak*, 30 S.Ct. 676, 681 (2010), the Supreme Court similarly recognized "some uncertainty as to whether *Mills* [*v. Maryland*, 486 U.S. 367 (1988)(remanding a death penalty case

for re-sentencing due the "substantial probability that reasonable jurors. . . may have thought they were precluded from considering any mitigating evidence" based on jury instructions)] was 'clearly *established* Federal law' for the purpose of reviewing the Ohio Supreme Court's opinion[.]" The Court noted other cases addressing this issue:

> *Williams v. Taylor,* 529 U.S. 362, 390, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (STEVENS, J., for the Court) (applicable date for purposes of determining whether "Federal law" is "established" is when the "state-court conviction became final"), with *id.,* at 412, 120 S.Ct. 1495 (O'Connor, J., for the Court) (applicable date is "the time of the relevant state-court decision"); see *State v. Spisak,* 36 Ohio St.3d 80, 521 N.E.2d 800 (decided Apr. 13, 1988), cert. denied, 489 U.S. 1071, 109 S.Ct. 1354, 103 L.Ed.2d 822 (decided Mar. 6, 1989); *Mills v. Maryland, supra* (decided June 6, 1988).

*Smith v. Spisak*, 30 S.Ct. at 681. "A legal principle is 'clearly established' within the meaning of [28 U.S.C. 2254(d)(1)] only when it is embodied in a holding" of the United States Supreme Court. *Thaler v. Haynes*, – U.S. –, 130 S.Ct. 1171, 173 (2010)(citations omitted). "'[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by" the Supreme Court. *Harrington v. Richter*, 131 S.Ct. 770, 778 (2011)(quoting *Knowles v. Mirzayance*, 556 U.S.——, ——, 129 S.Ct. 1411, 1413–14 (2009) (internal quotation marks omitted)).

Regardless, however, of whether the *J.D.B.* is clearly established federal law within the meaning of 28 U.S.C. § 2254(d), the end result is the same.

Petitioner does not dispute the factual findings of the state appellate court. Instead, he argues that the state appellate court misapplied federal law in determining he was not in custody while being questioned by police, and failed to consider determinative facts, including Petitioner's age, his removal by police from his house, the presence of additional police personnel outside of the car

in which he was being questioned during questioning, and application by police of increased pressure after Petitioner's father exited the vehicle, including use of the "minimalization technique." *See Traverse*. Additionally, Petitioner contends that the state court improperly failed to apply *Missouri v. Seibert*, 542 U.S. 611-12, in concluding Petitioner's confession was constitutionally admissible, as police questioned him first and later advised him of his *Miranda* rights.

Upon review of the record, the Magistrate Judge is not persuaded by Petitioner's arguments. The record indicates Detective Mike Warden and two other non-uniformed police officers arrived at Petitioner's home in an unmarked police vehicle to investigate. *Transcript, Hearing on Motion to Suppress*, at 110-111. Detective Warden knocked on the door. Petitioner's father answered. *Id*. at 111. Warden advised Petitioner's father they were investigating the death of Nancy and Emma Tidd, and asked if they could speak to Chris. *Id*. at 112. They walked into the house. Detective Warden introduced himself to Petitioner, told him he worked with the Sheriff's office and they wanted to interview him. *Id*. Detective Warden asked Petitioner's father if it was okay. Petitioner's father requested to sit in. *Id*. Warden told him it was no problem. Petitioner was sitting at the kitchen table with a blanket wrapped around him, wearing blue jeans and no shirt when police arrived. Petitioner went into his bedroom, and put on a shirt and shoes. *Id*. They walked outside to the unmarked police car parked in the drive. Warden and Petitioner were seated in the front, with Petitioner's father seated behind Petitioner, and Officer Stephens behind Detective Warden. *Id*. at 113. There was no cage in the car, and the doors were unlocked. Detective Warden advised Petitioner that he was not under arrest and did not have to speak to police. *Id.; see also id.* at 115. Warden told Petitioner he could leave at any time, "just get out of the car and walk away." *Id*. at 113. Petitioner indicated he understood. *Id*. During this time, Detective Kapple was "up at the

house" talking to other family members. *Id*. at 115. Petitioner denied any involvement in the crime, stating his uncle had picked him up from his grandmother's house earlier in the day. At that point, Detective Warden asked Petitioner's father if he would step out of the car, so that the detective could speak to him. *Id*. at 118. He told Petitioner's father that Petitioner was lying. He asked to speak with Petitioner alone. *Id*. Detective Warden got back in the car "and got a little more accusatory towards" Petitioner. *Id.* at 119. Petitioner continued to deny any involvement. About that time, Officer Stephens got a phone call and stepped out of the car. While Stephens was out of the car, Petitioner confessed. *Id.* at 121-22. Detective Warden motioned to Officer Stephens, who re-entered the car, and Petitioner told police what had happened. *Id*. at 122-126. Prior to taking a taped statement, police advised Petitioner of his *Miranda* rights. *Id*. at 127. The taped interview began at 12:19 a.m. *Id*. at 130. Police arrived at the house at approximately 11:35 p.m. *Id*. at 110. They began to interview Petitioner at approximately 11:50 p.m. *Id.* at 145.

Based on these facts, the Magistrate Judge is unable to conclude that the state appellate court's decision rejecting Petitioner's claim contravened or unreasonably applied federal law, or constituted an unreasonable determination of the facts in view of the evidence presented. As noted by the state appellate court, the record fails to reflect use of coercive or threatening police techniques or an atmosphere such as would cause a reasonable person to understand he was not free to leave. Petitioner voluntarily dressed and accompanied police to the unmarked car with his father to speak with them. The period of time during which Petitioner was questioned by police was relatively brief. While two police officers accompanied Detective Warden, one of those was physically removed from and uninvolved with Petitioner's interview, and the other left the vehicle for a brief period during the time that Petitioner confessed. Moreover, police requested permission of

Petitioner's father, who was present during the initial portion of police questioning, and available outside of the car during the time that Petitioner confessed and later provided a taped statement. The record provides no indication that Petitioner did not understand that he was free to leave and could go at any time without speaking to police.

The Magistrate Judge is likewise unpersuaded that the record reflects a violation of *Missouri v. Seibert*, 542 U.S. at 600, so as to warrant federal habeas corpus relief. *Seibert* involved admission of statements made during a custodial interrogation, where no *Miranda* warnings were given until after an inadmissible confession already had been made. *Missouri v. Seibert*, 542 U.S. at 604. Such were not the circumstances here. Petitioner was free to leave until he admitted his involvement in the crime to police.

Claim one is without merit.

## CLAIM TWO

In claim two, Petitioner asserts he was denied effective assistance of trial counsel because his attorney failed to object to his sentence as a serious youthful offender; failed to consult with an expert or present expert testimony on false and coerced confessions; failed to consult with an expert or present expert testimony on ballistics or consult with a crime scene reconstructionist; failed to request a DNA comparison on material found on the shotgun used to kill Nancy and Emma Tidd; and failed to object to introduction of prior bad acts evidence.

Petitioner failed to present his claim of ineffective assistance of counsel based on his attorney's failure to object to his sentence to the Ohio Supreme Court. This claim, therefore, is procedurally defaulted.

**Procedural Default:**

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims is required fairly to present those claims to the highest court of the state for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present the claims, his petition is subject to dismissal for failure to exhaust state remedies. *Id.; Anderson v. Harless,* 459 U.S. 4, 6 (1982) ( *per curiam* ); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). If, because of a procedural default, the petitioner can no longer present his claims to a state court, he has also waived them for purposes of federal habeas review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional error. *Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In the Sixth Circuit, a four-part analysis must be undertaken when the state argues that a federal habeas claim is precluded by the petitioner's failure to observe a state procedural rule. *Maupin v. Smith,* 785 F.2d 135, 138 (6th Cir.1986). "First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule." *Id.* Second, the court must determine whether the state courts actually enforced the state procedural sanction. *Id.* Third, it must be decided whether the state procedural forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Id.* Finally, if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *Id.* This

"cause and prejudice" analysis also applies to failure to raise or preserve issues for review at the appellate level. *Leroy v. Marshall,* 757 F.2d 94 (6th Cir.1985).

Petitioner properly raised his claim of ineffective assistance of counsel based on his attorney's failure to object to his sentence on direct appeal; however, he failed again to raise this same claim on appeal to the Ohio Supreme Court. Similarly, the sole issue relating to improper admission of evidence and ineffective assistance of counsel presented to the Ohio Supreme Court involved Petitioner's claim that his attorney performed in a constitutionally ineffective manner by failing to object to testimony by Detective Kapple. Further, he may now no longer present these issues to the Ohio Supreme Court under Ohio's doctrine of *res judicata. See State v. Cole,* 2 Ohio St.3d 112 (1982); *State v. Ishmail,* 67 Ohio St.2d 16 (1981); *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). The state courts were never given an opportunity to enforce the procedural rule at issue due to the nature of Petitioner's procedural default.

The Magistrate Judge finds that Ohio's *res judicata* rule is adequate and independent under the third part of the *Maupin* test. To be "independent," the procedural rule at issue, as well as the state court's reliance thereon, must rely in no part on federal law. *See Coleman v. Thompson,* 501 U.S. 722, 732-33 (1991). To be "adequate," the state procedural rule must be firmly established and regularly followed by the state courts. *Ford v. Georgia,* 498 U.S. 411 (1991). "[O]nly a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review by this Court of a federal constitutional claim." *Id.* at 423 (quoting *James v. Kentucky,* 466 U.S. 341, 348-351 (1984)); *see also Barr v. City of Columbia,* 378 U.S. 146, 149 (1964); *NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 297 (1964); *see also Jamison v. Collins,* 100 F.Supp.2d 521, 561 (S.D. Ohio 1998).

The Sixth Circuit has consistently held that Ohio's doctrine of *res judicata, i.e.,* the *Perry* rule, is an adequate ground for denying federal habeas relief. *Lundgren v. Mitchell,* 440 F.3d 754, 765 (6th Cir.2006); *Coleman v. Mitchell,* 268 F.3d 417, 427-29 (6th Cir.2001); *Seymour v. Walker,* 224 F.3d 542, 555 (6th Cir.2000); *Byrd v. Collins,* 209 F.3d 486, 521-22 (6th Cir.2000); *Norris v. Schotten,* 146 F.3d 314, 332 (6th Cir.1998). Ohio courts have consistently refused, in reliance on the doctrine of *res judicata,* to review the merits of claims because they are procedurally barred. *See State v. Cole,* 2 Ohio St.3d at 112; *State v. Ishmail,* 67 Ohio St.2d at 16. Additionally, the doctrine of *res judicata* serves the state's interest in finality and in ensuring that claims are adjudicated at the earliest possible opportunity. With respect to the independence prong, the Magistrate Judge concludes that *res judicata* does not rely on or otherwise implicate federal law. Accordingly, the Magistrate Judge is satisfied from its own review of relevant case law that the *Perry* rule is an adequate and independent ground for denying relief.

Petitioner may still obtain review of this claim on the merits if he establishes cause for his procedural default, as well as actual prejudice from the alleged constitutional violation.

> " '[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[;] ... some objective factor external to the defense [that] impeded ... efforts to comply with the State's procedural rule." *Coleman v. Thompson*, 501 U.S. 722, 753 (1991).

*Maples v. Stegall,* 340 F.3d 433, 438 (6th Cir. 2003). The constitutionally ineffective assistance of counsel may constitute cause for a procedural default. *Edwards v. Carpenter,* 529 U.S. 446, 451 (2000)(citing *Murray v. Carrier*, 477 U.S. 478, 488-89 (1986)). However, ineffective assistance of counsel cannot constitute cause where, as here, there was no constitutional right to counsel in the proceeding in question. There is no constitutional right to counsel in direct appeal to the Ohio

Supreme Court. *See Gulertekin v. Tinnelman-Cooper,* 340 F.3d 415, 425 (6th Cir. 2003)(citing

*Coleman v. Thompson,* 501 U.S. 722, 752-53 (1991); *Pennsylvania v. Finley,* 481 U.S. 551, 555

(1987) ("[T]he right to counsel extends to the first appeal of right, and no further."); *Lopez v. Wilson,*

426 F.3d 339, 352 (6th Cir. 2005)).

Beyond the four-part *Maupin* analysis, a habeas court is required to consider whether this

is "an extraordinary case, where a constitutional violation has probably resulted in the conviction

of one who is actually innocent." *Murray v. Carrier,* 477 U.S. at 491; *see also Sawyer v. Whitley*,

505 U.S. 333 (1992).

> [I]f a habeas petitioner "presents evidence of innocence so strong that
> a court cannot have confidence in the outcome of the trial unless the
> court is also satisfied that the trial was free of nonharmless
> constitutional error, the petitioner should be allowed to pass through
> the gateway and argue the merits of his underlying claims." *Schlup,*
> 513 U.S. at 316, 115 S.Ct. 851. Thus, the threshold inquiry is whether
> "new facts raise[ ] sufficient doubt about [the petitioner's] guilt to
> undermine confidence in the result of the trial." *Id.* at 317, 115 S.Ct.
> 851. To establish actual innocence, "a petitioner must show that it is
> more likely than not that no reasonable juror would have found
> petitioner guilty beyond a reasonable doubt." *Id.* at 327, 115 S.Ct.
> 851. The Court has noted that "actual innocence means factual
> innocence, not mere legal insufficiency." *Bousley v. United States,*
> 523 U.S. 614, 623, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998). "To be
> credible, such a claim requires petitioner to support his allegations of
> constitutional error with new reliable evidence-whether it be
> exculpatory scientific evidence, trustworthy eyewitness accounts, or
> critical physical evidence-that was not presented at trial." *Schlup,* 513
> U.S. at 324, 115 S.Ct. 851. The Court counseled however, that the
> actual innocence exception should "remain rare" and "only be
> applied in the 'extraordinary case.'" *Id.* at 321, 115 S.Ct. 851.

*Souter v. Jones*, 395 F.3d 577, 589-90 (6th Cir. 2005). Petitioner has failed to meet this standard

here. He has waived his claim of ineffective assistance of counsel based on his attorney's failure

to object to his sentence and his attorney's failure to object to evidence other than testimony of prior

bad acts by Detective Kapple.

**Ineffective Assistance of Counsel – Merits:**

Petitioner properly has preserved his remaining claims of ineffective assistance of counsel

for federal habeas corpus review.  The state appellate court rejected these claims on direct appeal,

reasoning in relevant part as follows:

> In order to establish ineffective assistance of counsel, Sturm must show that his trial attorney's performance was both deficient and prejudicial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674; *State v. Bradley* (1989), 42 Ohio St.3d 136, 141-142, 538 N.E.2d 373. To be deficient, Sturm must show that his counsel's performance "fell below an objective standard of reasonableness." *Strickland* at 688. Sturm must also overcome the presumption that the challenged action might be considered sound trial strategy. *Id.* at 689. In order to show prejudice, Sturm must show that there is a reasonable probability that, but for his counsel's unprofessional errors, the outcome of the proceeding would have been different. *Id.* at 694.

> First, Sturm contends that his trial counsel was ineffective because he failed to retain an expert in the field of *Miranda* waivers and coerced and false confessions. Because we found that Sturm was not in custody and, thus, the detectives were not required to give him *Miranda* warnings, we conclude that Sturm's counsel was not deficient in failing to obtain an expert.

> ***

> Sturm contends that his trial counsel was ineffective because he failed to object to a portion of Detective Kapple's testimony, as argued in Sturm's third assignment of error. We concluded the State offered this testimony to show the jury how and why the investigation shifted from Frank Russell to Sturm. The State did not offer Kapple's testimony to show that Sturm had a propensity to commit bad acts and must be guilty of murder. We concluded the trial court did not

abuse its discretion in admitting this testimony. Accordingly, Sturm's counsel was not deficient for failing to object to it.

*State v. Sturm*, 2006 WL 3861074, at *17-18.

Sturm contends that the court improperly admitted character evidence of prior acts to show that Sturm had a propensity to commit these killings. Our standard of review is the well-recognized rule that the admission of evidence is within the sound discretion of the trial court. *State v. Sage* (1987), 31 Ohio St.3d 173, 510 N.E.2d 343, paragraph two of the syllabus. An abuse of discretion involves more than an error of judgment; it connotes an attitude on the part of the court that is unreasonable, unconscionable, or arbitrary. *Franklin Cty. Sheriff's Dept. v. State Emp. Relations Bd.* (1992), 63 Ohio St.3d 498, 506, 589 N.E.2d 24, 30. When applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court. *In re Jane Doe 1* (1990), 57 Ohio St.3d 135, 138, 566 N.E.2d 1181, 1184, citing *Berk v. Matthews* (1990), 53 Ohio St.3d 161, 169, 559 N.E.2d 1301, 1308.

Evid. R. 404(B) controls the use of other acts evidence and states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

The admissibility of other acts evidence is carefully limited because of the substantial danger that the jury will convict the defendant solely because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he or she committed the crime charged in the indictment. *State v. Schaim* (1992), 65 Ohio St.3d 51, 59, 600 N.E.2d 661, 668. Generally, evidence of other acts is not permissible when offered to show a trait, disposition, or propensity toward the commission of a certain type of crime. *State v. Aliff*, Lawrence App. No. 99CA8, 2000 WL 378370, at paragraph 10, citing *State v. Henderson* (1991), 76 Ohio App.3d 290, 293, 601 N.E.2d 596. However, under the rule it is admissible for other purposes such as, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

28

Sturm contends that the court improperly permitted Detective Kapple to testify about Sturm's prior acts to show that Sturm had a propensity to commit crimes. Kapple's testimony described a debriefing that occurred at the crime scene while other officers were interviewing Frank Russell. At the debriefing, Kapple gave his opinion that Sturm should be considered a suspect because of information indicating Sturm had a tendency towards violent behavior when he huffed gasoline, and it was common for him to spend time at his grandmother's residence. Kapple also told the officers that the description of the young man that West had picked up earlier matched Sturm.

Sturm's trial counsel failed to object to Kapple's testimony at trial. Evid.R. 103(A)(1) provides: "Error may not be predicted upon a ruling which admits ... evidence unless a substantial right of the party is affected and ... a timely objection or motion to strike appears of record stating the specific ground of objection, if the specific ground was not apparent from the context." Because Sturm failed to raise a character evidence objection at trial, he has waived all but plain error. *State v. Loza* (1994), 71 Ohio St.3d 61, 75, 641 N.E.2d 1082, 1100.

Crim.R. 52 allows plain errors to be recognized, stating that "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." As defined by the Supreme Court of Ohio, plain error does not exist unless it is clear that but for the error, the jury's verdict would have been otherwise. *State v. Moreland* (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. Importantly, the appellate court should exercise the utmost caution when taking notice of plain error under Crim.R. 52(B), invoking the rule only in exceptional circumstances and only to prevent a miscarriage of justice. *State v. Long* (1978), 53 Ohio St.2d 91, 372 N.E.2d 804, third paragraph of the syllabus.

We are not convinced that Kapple's statements rise to the level of plain error. The purpose of Kapple's testimony was to show how and why the State's investigation shifted from Frank Russell to Sturm rather than to establish Sturm had a propensity to commit bad acts. Kapple did not allege that Sturm was guilty of criminal misconduct, nor did he mention that Sturm was under investigation for an unrelated felony-level sexual assault. Moreover, assuming that the statements were improper, it does not clearly appear that the outcome of the trial would have been different had the testimony been

excluded. Therefore, we conclude that Kapple's testimony did not rise to plain error.

Sturm also argues even if this evidence is admissible under Evid.R. 404(B), it should have been excluded under Evid.R. 403 because the danger of unfair prejudice substantially outweighs its probative value. In light of the fact there was no specific objection and Evid.R. 403's clear preference for the admissibility of relevant evidence, we reject this contention.

*State v. Sturm,* 2006 WL 4823572, at *11-12.

The state appellate court thereafter again rejected Petitioner's claims in post conviction proceedings as follows:

Bryan Christopher Sturm appeals from a judgment denying his postconviction relief petition without an evidentiary hearing. He contends he presented sufficient operative facts to warrant an evidentiary hearing on his claims that trial counsel was ineffective because he failed to obtain experts on false/coerced confessions, ballistics, crime-scene reconstruction, and DNA.

. . . . In his direct appeal, Sturm unsuccessfully argued that trial counsel was deficient for failing to present an expert on false/coerced confessions during proceedings to determine the confession's admissibility. But here, Sturm contends that counsel was ineffective for failing to present such testimony at trial to assist the jury in weighing the credibility and reliability of the confession given the lack of physical evidence linking him to the killings. Moreover, Sturm must rely on evidence outside the record to support this claim, i.e., his trial counsel's affidavit reveals why he did not secure these experts, and the experts' reports indicate the kind of testimony they would have provided.

However, because Sturm failed to present substantive grounds for relief, i.e., he failed to produce sufficient credible evidence that demonstrates trial counsel's deficient performance and resulting prejudice, he was not entitled to an evidentiary hearing. In his affidavit, trial counsel stated that he initially hired Dr. Brams for both mitigation and false confessions but later realized she was "not

sufficient to do the false confession testimony at trial" and then at that point he believed there was insufficient time and/or lack of funding to get such an expert. However, according to Dr. Brams' psychological evaluation report, which trial counsel introduced during Sturm's dispositional hearing, Sturm essentially confessed to Dr. Brams two weeks prior to his trial. Given these circumstances, we cannot conclude that trial counsel was deficient for failing to secure yet another false/coerced confessions expert. Moreover, because Sturm failed to present any credible evidence to show that his confession was in fact false and/or coerced, i.e., evidence he has recanted or specific expert conclusions, he cannot show resulting prejudice. Sturm also failed to show resulting prejudice from trial counsel's failure to secure other experts. Many of the issues raised by these experts, i.e., the lack of physical evidence linking Sturm to the crimes, the investigators' failure to analyze certain physical evidence, and the inconsistencies between Sturm's confession and the evidence found at the scene, were addressed at trial and vigorously argued by trial counsel during closing arguments. Finally, because Sturm actually confessed to the murders, we simply cannot conclude that he was prejudiced by trial counsel's failure to obtain these other experts.

\* \* \*

In support of his petition, Sturm submitted reports from John R. Nixon and Gary A. Rini; the affidavit of Deborah Davis, Ph.D.; a letter from Julie A. Heinig, Ph.D.; the affidavit of Raymond Smith, Sturm's trial counsel; the affidavits of two jurors; and the affidavit of Kelly Heiby, an investigator with the Office of the Ohio Public Defender.

\* \* \*

The Sixth Amendment to the United States Constitution and Section 10, Article I, of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The Supreme Court of the United States has generally interpreted this provision to mean a criminal defendant is entitled to the "reasonably effective assistance" of counsel. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To prevail on a claim of ineffective assistance of counsel, Sturm must show (1) his counsel's performance was deficient in that it fell below an objective standard of reasonable representation, and (2) the

31

deficient performance prejudiced his defense so as to deprive him of a fair trial. *State v. Smith* (2000), 89 Ohio St.3d 323, 327, 731 N.E.2d 645, citing *Strickland* at 687; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. To establish prejudice, Sturm must show that there is a reasonable probability that, were it not for counsel's errors, the result of the proceeding would have been different. *State v. White* (1998), 82 Ohio St.3d 16, 23, 693 N.E.2d 772; *Bradley* at paragraph three of the syllabus. Failure to establish either element is fatal to the claim. *Strickland; Bradley.*

When considering whether trial counsel's representation is deficient, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland* at 689. Thus, "the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.*

Generally, the decision whether to call a witness "falls within the rubric of trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh,* 90 Ohio St.3d 460, 490, 2001-Ohio-4, 739 N.E.2d 749; see, also, *State v. William* (1991), 74 Ohio App.3d 686, 694, 600 N.E.2d 298. Furthermore, the failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel. *State v. Nicholas* (1993), 66 Ohio St.3d 431, 436, 613 N.E.2d 225; see, also, *State v. Thompson* (1987), 33 Ohio St.3d 1, 10-11, 514 N.E.2d 407; *State v. Hartman,* 93 Ohio St.3d 274, 299, 2001-Ohio-1580, 754 N.E.2d 1150. "In many criminal cases, trial counsel's decision not to seek expert testimony 'is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant.' " *State v. Krzywkowski,* Cuyahoga App. Nos. 83599, 83842, and 84056, 2004-Ohio-5966, ¶ 22, quoting *State v. Glover,* Clermont App. No. CA2001-12-102, 2002-Ohio-6392, ¶ 95; see, also, *State v. Samatar,* Franklin App. No. 03AP-1057, 2004-Ohio-2641, ¶ 12. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time." *In re: J.B.,* Butler App. No. CA2005-06-176, CA2005-07-193, CA2005-08-377, 2006-Ohio-2715, ¶ 18, citing *State v. Gapen,* Montgomery App. No. 20454, 2005-Ohio-441, ¶ 30.

V. Sturm's Petition and Supporting Evidence

In his first through fourth grounds for relief, Sturm claimed that he was denied effective assistance of counsel because trial counsel failed to obtain funds to secure experts in (1) false/coerced confessions; (2) ballistics; (3) crime scene reconstruction; and (4) DNA. Essentially, Sturm argued that there were such obvious factual inconsistencies between his confession (the centerpiece of the State's case) and the crime scene evidence (none of which directly linked him to the killings) that his confession was not believable. He argued that given his age and the other circumstances surrounding his confession, as well as the investigators' substandard investigation (including their failure to sufficiently test or analyze the physical evidence), trial counsel should have presented the testimony of experts to rebut the State's case.

As we previously stated, Sturm submitted several affidavits and other documentary evidence to support his petition,[FN3] including an affidavit from his trial counsel, who swore to the following facts:

FN3. Sturm submitted affidavits of two jurors and an affidavit of an investigator with the Ohio public defender's office who interviewed several jurors. However, the trial court properly concluded that under Ohio's *aliunde* rule the jurors were not competent to testify concerning their mental processes during the trial and to the effect that the experts' testimony would have had on their decision. See Evid.R. 606(B); see, also, *State v. McKnight,* Vinton App. No. 07CA665, 2008-Ohio-2435, at ¶¶ 48-52, citing *State v. Hessler* (2000), 90 Ohio St.3d 108, 124, 734 N.E.2d 1237. Evid.R. 606(B) would also prohibit hearsay testimony concerning the jurors' statements. See *McKnight,* supra, at ¶ 52. However, because Sturm does not raise this issue, we need not address it further.

1. Affiant states I was the lead counsel who represented Bryan Christopher Sturm.

2. Affiant further states that I contracted the services of Dr. Jolie Brams for both mitigation and false confessions regarding juveniles.

3. Affiant further states that the contract was through the Ohio Public Defender's Commission and that her rate was in the neighborhood of $6,000.00.

4. Affiant further states by the time the case was ready for trial, I realized that Dr. Brams was not sufficient to do the false confession testimony at trial and was only going to be utilized in mitigation to avoid the SYO finding.

5. Affiant further states that our annual budget for experts at the Washington County Branch is $10,000.00.

6. Affiant further states there was insufficient money to hire nor was there sufficient time to hire a false confession expert.

7. Affiant further states that the trial in this case was held as fast as possible since the Defendant was in lock-down detention.

8. Affiant further states that I assumed that the presumed murder weapon was the weapon involved in this case.

9. Affiant further states that I did not believe there was a reason to hire a ballistics expert nor the funds to do so.

10. Affiant further states that the lack of hiring a ballistics expert in this case had nothing to do with trial strategy.

11. Affiant further states the [sic] I did not contract the hire of a crime scene reconstructionalist in this case.

12. Affiant further states that the sole reason for the lack of hiring a crime scene rescontructionalist [sic] was due to funding.

13. Affiant further states that the lack of hiring a crime scene reconstructionalist had nothing to do with trial strategy.

Sturm also submitted an affidavit from Davis, a psychologist and expert in coerced and false confessions. In her affidavit, Davis opined that jurors do not appear to understand, in the absence of expert testimony, that false confessions do occur, why they occur and what factors might promote a false confession, how an innocent suspect could provide details about the crime, what kind of suspects might be particularly susceptible to making a false confession, or how to tell the difference between true and false confession. She then discussed

several general principles concerning why suspects confess falsely that were "particularly relevant to this case," including police interrogation techniques and that a suspect may be especially vulnerable due to youth. She also stated that research has shown that false confessions to more serious crimes such as murder were more common than those to less serious crimes. Davis' affidavit does not indicate whether she personally interviewed Sturm or whether she otherwise familiarized herself with the evidence presented in this case.

Nixon, a ballistics expert, indicated in his report that he had reviewed several documents relating to this case, including transcripts of the police interview and the testimony of the State's medical examiner and firearms examiner; forensic reports relating to DNA, fingerprints, autopsy, and firearms evidence; autopsy and crime scene photographs; and a police sketch of the scene. He concluded that "too many things just don't add up in this case." He opined that Sturm's confession did not "mesh" with the subsequent evidence analysis. For example, in his confession Sturm makes no mention of the blunt trauma attack to his grandmother's head, and he claims that both fatal shots were fired from several feet away, yet the victims suffered "contact" wounds. He also stated that there were several technical issues involving the shotgun that were not addressed at trial, including a valid trigger analysis, whether it was an ejector model-an important consideration for Gunshot Residue Analysis (GSR) and speed of reloading-and a mass analysis of the slug fragments recovered from the victims. He noted that because the caliber of the slugs could not be determined and because there is no evidence to link this gun to the fired projectiles, the possibility exists that another gun was used to commit the homicides. He also noted that testimony of the medical examiner and firearms examiner was not objective. He concluded that the fact that there was no blood or tissue on the muzzle of the .410 shotgun gun indicates that this was not the murder weapon and that there should have been blood found on Sturm's shirt if he had committed the crime. Finally, he made several suggestions concerning additional testing that he believed should have been done.

The report from Rini, an expert in crime scene reconstruction, indicated that he had reviewed evidence from this case. He concluded that the crime scene investigation conducted in this case failed to meet the minimal standards of a professional crime scene investigation and that as a result, potential exculpatory evidence may have been lost, destroyed, missed, or otherwise compromised. For example, he criticized investigators for failing to collect evidence of shoeprints

impressions as well as latent print and tool mark evidence from the gun cabinet, failing to establish an approximate time of death, allowing Frank Russell into the crime scene, and failing to sufficiently document/photograph the scene and reconstruct the shooting. He stated that the evidence demonstrates that the victims did not struggle or move at the time of the shooting and thus "suggests the possibility of a simultaneous, or near-simultaneous shooting of the decedents." He also concluded that the lack of DNA evidence on the barrel or in and around the muzzle of the .410 shotgun was "remarkably inconsistent" with the nature of the victims' head wounds. He also analyzed the manner in which Sturm's interrogation was conducted and described the methods as "deplorable" and by professional standards of care "suspect, at best." Specifically, he noted:

The fact that a police vehicle was used for the interrogation room; that the juvenile was not represented by counsel or an adult advocate; that the interrogation was interrupted by an individual exiting and re-entering the vehicle draws into question the motivation, professionalism, legitimacy, reliability and results of the interrogation.

The questioning and interrogation of a juvenile offender requires special talents and training. There is no evidence that the individual conducting this specialized interrogation received any specialized training in the interrogation of juvenile suspects or that the interrogation was conducted according to professional standards employed in the interrogation of juvenile suspects.

Finally, Sturm submitted a letter from Heinig, an assistant laboratory director at the DNA Diagnostic Center ("DDC"), to Ms. Beeler. Heinig indicated that according to a BCI & I report she had reviewed, a partial DNA profile was obtained from evidentiary item # 4S3 (swabbing from the stock end of the shotgun) at three genetic loci and that the contributor of the DNA was male. She also stated that it appeared that a reference strand from Sturm was never submitted to or tested by BCI & I. She then addressed the possibility of having Sturm's reference standard collected and tested and compared. She indicated that if the alleles at any one of the genetic loci do not match then Sturm would be excluded as a contributor to the DNA. She also explained that it's the policy at DDC to compare four loci or more for an inclusion to be reported and that in this case, the DNA from the item would be insufficient for a match comparison. She also indicated that at DDC they have been able to detect blood after a garment was washed five times and that they have been able to obtain DNA after

one wash. Finally, she stated that so long as there is enough DNA to work with and the surface had not been wiped clean, the likelihood of obtaining DNA from a gun is good.

## VI. Trial Court's Decision

In its decision denying Sturm's petition without a hearing, the trial court found:

In this case, Bryan C. Sturm's trial counsel did not seek the appointment of experts on confessions, ballistics, DNA or crime scene reconstruction and instead relied upon cross-examination of the State's witnesses to rebut the State's charge that appellant was guilty of murdering his grandmother and aunt. A review of the record demonstrates that appellant's trial counsel conducted a thorough cross-examination of the state's various experts. His trial counsel explored numerous pertinent issues, as shown by the following exchanges from the transcript.

After reviewing several portions of the transcript of trial counsel's cross-examination of various State witnesses, the court went on to conclude:

Petitioner, Bryan C. Sturm, has failed to demonstrate that the actions of his trial counsel were outside the wide range of professionally competent assistance. Petitioner's assertions that the use of experts would have altered the outcome of his trial are pure speculation. Petitioner's counsel's performance was neither deficient nor prejudicial. Attorney Smith is a veteran criminal trial attorney and head of the local office of the Public Defender. His failure to call expert witnesses at trial and instead rely on cross-examination does not constitute ineffective assistance of counsel. The affidavit of Attorney Smith submitted in support of the petition is disingenuous and certainly another indication that Attorney Smith is a zealous and competent trial counsel. Attorney Smith claims in his affidavit that his failure to hire experts was not based on trial strategy but rather due to funding. He is still attempting to do all he can to help his former client, even by claiming to be deficient. This Court refuses to believe the self-serving nature of this affidavit. For one full week of a jury trial, Attorney Smith vigorously defended his client. Given the fact that this was a double homicide committed by a 12 year old; that the

serious youthful offender disposition was being sought by the State, and that at the time it appeared to be the first jury trial in the State under the serious youthful offender statute, Attorney Smith could have had at his disposal unlimited resources. He hired one expert for the sentencing phase, but now wants the Court to believe that he couldn't hire others due to funding. He insisted on pushing the State to a quick trial and, as such, this Court believes and finds that he purposely decided to forego the use of experts for that reason and as part of his trial strategy, despite what he now states in his affidavit.

On appeal, Sturm contends that the trial court erred in denying his petition, or at the very least, in refusing to conduct a hearing because he stated substantive grounds for relief and supported his petition with evidentiary materials alleging sufficient operative facts to demonstrate that he received ineffective assistant of counsel.

*In re B.C.S.*, 2008 WL 4823572, at *1-9.

In his direct appeal, Sturm raised the issue of ineffective assistance based on his counsel's failure to secure the assistance of expert witnesses, including an expert in the field of *Miranda* waivers and coerced and/or false confessions. Sturm argued that because trial counsel prior to trial alluded to the fact that his confession may have been coerced and false, trial counsel should have consulted with and sought the testimony of an expert in the field of coerced and false confession "in order to properly present that issue to the court." In a separate assignment of error, Sturm argued that the trial court erred in overruling his motion to suppress his confession because it was obtained in violation of his *Miranda* rights; he further argued that even if his *Miranda* rights were not violated, his confession must still be suppressed because it was unreliable due to his age, the circumstances surrounding the interview, and the fact that it was inconsistent with the physical evidence found at the scene.

We rejected these claims. First, we concluded that because Sturm was not in custody at the time of the interview, the detectives were not required to advise him of the *Miranda* rights; we then rejected his "unreliability" arguments "based upon the lack of authority and the non-coercive nature of the interview as indicated by the record." In so doing, we noted:

Normally, unreliability is related to voluntariness and becomes an issue where coercion is involved. There is no evidence of any coercion in this record, including the interrogation techniques. Simply because Sturm's confession does not exactly mirror the evidence, does not render it unreliable. In his admission, Sturm attempted to minimize his culpability in the crimes by claiming they were accidental. The minor factual inconsistencies between Sturm's confession and the evidence found at the crime scene do not render his confession inadmissible.

Next, in rejecting his ineffective assistance of counsel claim for failing to retain an expert in the field of *Miranda* waivers and coerced and false confession, we concluded that because Sturm was not in custody and, thus, the detectives were not required to give him *Miranda* warnings, Sturm's counsel was not deficient in failing to obtain an expert.

In his postconviction petition, however, Sturm presents a different argument. He does not contend that trial counsel was ineffective for failing to present the testimony of an expert on coerced and false confessions to the court, i.e., during the suppression hearing as a basis to exclude his confession. Rather, he claims that the jurors should have been educated about the occurrence and nature of false confessions and argues that such evidence "could have had a significant and material impact on the way the trier of fact understood, interpreted, and weighed the evidence that was presented."

In *Crane v. Kentucky* (1986), 476 U.S. 683, 106 S.Ct. 2142, 90 L.E.2d 636, the United States Supreme Court recognized that while a trial court has the duty to determine whether a confession is voluntary, a jury has the duty to assess its reliability. *Crane* at 688; see, also, *State v. Bailey* (1992), 90 Ohio App.3d 58, 69, 627 N.E.2d 1078. In *Crane,* a sixteen-year-old defendant sought to introduce testimony regarding the psychological impact of the length of his interrogation and the manner in which it was conducted. The Court held that the exclusion of the testimony about the circumstances of the defendant's confession deprived him of his fundamental constitutional right to a fair opportunity to present a defense. The Court recognized that while the issue of whether a confession is voluntary is a question of law for the court, the jury was entitled to hear the excluded testimony in order to

make a factual determination of whether the manner in which the confession was obtained cast doubts on its credibility. *Id.* at 689.

The Court reasoned:

> The manner in which a statement was extracted is, of course, relevant to the purely legal question of its voluntariness, a question most, but not all, States assign to the trial judge alone to resolve. But the physical and psychological environment that yielded the confession can also be of substantial relevance to the ultimate factual issue of the defendant's guilt or innocence. Confessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise ... unworthy of belief.' Indeed, stripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt? Accordingly, regardless of whether the defendant marshaled the same evidence earlier in support of an unsuccessful motion to suppress, and entirely independent of any question of voluntariness, a defendant's case may stand or fall on his ability to convince the jury that the manner in which the confession was obtained casts doubt on its credibility.

*Crane* at 688-689 (citations omitted).

After distinguishing the voluntariness of a confession from the reliability of that confession, *Crane* recognized a criminal defendant's general constitutional right to present competent, credible evidence that bears on the reliability of his confession:

> Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal

defendants 'a meaningful opportunity to present a complete defense.' We break no new ground in observing that an essential component of procedural fairness is an opportunity to be heard. That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and 'survive the crucible of meaningful adversarial testing.'

*Id.* at 690-691.

Applying this rationale to our case, we believe that Sturm's current ineffective assistance of counsel claims present a different issue than that raised on his direct appeal. We previously addressed and rejected his claims within the context of the purely legal question of whether his confession was admissible; Sturm did not argue and we did not address his current claim that trial counsel was ineffective for failing to present this "impeachment" evidence to the jury.

\*\*\*

We previously rejected Sturm's "unreliability" claims "based upon the lack of authority and the non-coercive nature of the interview *as indicated by the record*" and noted that there was "no evidence of any coercion *in the record,* including the interrogation techniques." [Emphasis added]. In support of his postconviction claims, however, Sturm presents his trial counsel's affidavit and supporting documents, including expert reports. We believe that this constitutes competent, relevant and material evidence outside the record sufficient to avoid operation of the *res judicata* doctrine. While the record shows that defense counsel did not call these experts, it does not indicate his motivation in failing to call these experts or what testimony the experts would have provided to the jury. Without record evidence explaining why defense counsel failed to call an expert, Sturm could not demonstrate deficient performance. Without record evidence setting forth what such an expert would have told the jury, he could not demonstrate prejudice flowing from the absence of the testimony.

As a result, Sturm must present evidence *dehors* the record to establish his claim. *See State v. Jenkins,* Miami App. No.2003-CA-1, 2003-Ohio-4428, at ¶ 40 (appellant's ineffective assistance of counsel claims required presentation of evidence outside the record because while the record revealed that no expert was called, it did not reveal why defense counsel failed to call an expert or what such expert testimony would have provided at trial). In other words, given that this evidence was needed in order to resolve Sturm's claims, he could not have raised them on direct appeal, and they are not barred by *res judicata. See State v. Bragenzer,* Pickaway App. No. 03CA1, 2003-Ohio-5597, at ¶ 12 (appellant's petition was not barred by *res judicata* because, contrary to the State's assertion, he could not have based his direct appeal upon matters not in the record, such as his trial counsel's affidavit); *State v. Tate,* Perry App. No. 99 CA 28, 2000 WL 1468587 (trial counsel's affidavit admitting his deficiency in not investigating the issue of bad time and in not filing appropriate pretrial motions constituted evidence dehors); see, also, *State v. Walker,* supra.

## VIII. Substantive Grounds for Relief

### A. Trial Counsel's Affidavit

Sturm contends that the trial court failed to give due deference to trial counsel's affidavit and then summarily concluded that Sturm's "assertions that the use of experts would have altered the outcome of this trial are pure speculation." The court found that counsel's failure to call expert witnesses at trial and to rely instead on cross-examination was merely strategic. Sturm contends this finding is unsupported in the record and is directly contradicted by counsel's affidavit. He argues that the trial court improperly assumed that because trial counsel is an experienced attorney capable of effective cross-examination, he purposely chose not to use defense experts. Sturm argues that the conflict between trial counsel's affidavit and the court's assumptions should have resulted in an evidentiary hearing. Sturm also contends that the trial court erred in finding that trial counsel's affidavit was "self-serving" and so unworthy of belief on its face that a hearing was unnecessary to determine whether the affidavit was factually true. The State, on the other hand, contends that the trial court acted within its discretion in assessing the sufficiency of Sturm's supporting affidavits because, as the judge who presided over Sturm's trial, the court was in the best position to judge their credibility by comparing them to the testimony presented at trial.

## B. Due Deference

While a trial court may, in its sound discretion, judge the credibility of affidavits sworn under oath and filed in support of the petition, it must give them "due deference." See *Calhoun* at 284, 714 N.E.2d 905. Moreover, "[a]n affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false." *Id.* Furthermore, the affidavit of a defense attorney, who is an officer of the court and has no personal interest in the success of a defendant's petition, is entitled to greater weight than a defendant's "self-serving" affidavit. See *State v. Kinley* (1999), 136 Ohio App.3d 1, 16, 735 N.E.2d 921, discretionary appeal not allowed in (2000), 88 Ohio St.3d 1444, 725 N.E.2d 284, citing *State v. Kapper* (1983), 5 Ohio St.3d 36, 38, 448 N.E.2d 823 (letter or affidavit from the court, prosecutors, or defense counsel alleging a defect in the plea process might be sufficient to warrant a hearing, although defendant's own affidavit alleging same defect would not, because the former are not self-serving declarations). Finally, "[a] trial court that discounts the credibility of sworn affidavits should include an explanation of its basis for doing so in its findings of fact and conclusions of law, in order that meaningful appellate review may occur." *Calhoun* at 285, 714 N.E.2d 905.

Essentially, the trial court found that trial counsel was an experienced and competent criminal trial attorney, who held a position of responsibility in the Office of the Ohio Public Defender; yet it found his affidavit to be "disingenuous" and "self-serving." We find the trial court's explanation of its basis for discounting the credibility of the sworn affidavit to be internally inconsistent. Also, while trial counsel may have thoroughly cross-examined the State's witnesses, his ability to do so does not rebut his sworn statement that his decision to forego the use of experts was due to his perception about a lack of funding and/or insufficient time. And, while the judge who considered Sturm's petition was the same judge who presided over his trial and thus may have had personal knowledge concerning discussions not found on the record, there is nothing in the record that contradicts trial counsel's affidavit or that supports the trial court's finding that his decision to forego the use of experts was to push the State to a quick trial or that he "could have had at his disposal unlimited resources." Finally, because there is nothing in the record that suggests trial counsel has a personal stake in the outcome in this case, we reject the trial court's finding that trial counsel's affidavit was "self-serving." We are aware there may be instances of "professional martyrdom" as an appellate

strategy or technique, see *State v. Young,* Hancock App. Nos. 5-95-4, 5-95-6, 1995 WL 380049 (trial counsel discrediting his own conduct by attesting to his professional misconduct in knowing his client's wishes but nevertheless misinforming or misleading that client and the court). However, we see nothing in his affidavit or the record to suggest that the trial court could have reasonably rejected trial counsel's sworn affidavit on its face. Thus, it appears the trial court failed to give trial counsel's affidavit due weight. Nonetheless, to the extent that the trial court failed to give the affidavit due deference, we believe it constitutes harmless error because even if we accept trial counsel's sworn averments as true statements of fact, Sturm failed to allege sufficient operative facts to warrant a hearing.

IX. Lack of Sufficient Credible Evidence to Warrant a Hearing

Based on our review of the petition, the supporting documentation, and the record in this case, we conclude the trial court's decision that Sturm was not entitled to a hearing on his petition was correct. We do so on the basis that we review the court's judgment, not the rationale behind it. *Myers v. Garson,* 66 Ohio St.3d 610, 614 N.E.2d 742, 1993-Ohio-9. Here, Sturm's petition failed to present operative facts which, even if proven at a hearing to be true, demonstrate that trial counsel was deficient for failing to present expert testimony to rebut the State's case. Moreover, his petition failed to show that any deficient performance on the part of trial counsel actually resulted in prejudice.

We begin our analysis by addressing trial counsel's failure to secure an expert in the field of false/coerced confessions. In his affidavit, trial counsel stated that he initially hired Dr. Brams for both mitigation and false confessions regarding juveniles but later realized she was "not sufficient to do the false confession testimony at trial," and then at that point, he believed there was not enough time or money to get such an expert. However, he failed to explain *why* she was "not sufficient." He did not state whether he realized that she was not qualified to testify as a false confessions expert or whether he simply discovered that her opinion would not be favorable to Sturm. He also failed to explain why, if he believed such an expert was warranted, he did not, at a minimum, raise the issue of the lack of funding with the trial court or request a continuance of the trial to further investigate his options. Nor does he affirmatively state that his decision to forego the use of a false/coerced confession expert was not in fact based on "trial strategy." In his affidavit, trial counsel specifically states that the lack of hiring a crime scene reconstructionist and ballistics expert "had

nothing to do with trial strategy." However, concerning his decision about a false/coerced confessions expert, he simply makes the factual assertion that there was insufficient time and money to hire such an expert. In other words, he does not specifically state that his decision to forego the use of such an expert was a direct result of his belief that there was insufficient time and/or money, or whether it was based, at least in part, on a trial strategy.

Our review of the record, however, shows that his decision not to secure a false/coerced confessions expert was objectively reasonable under the circumstances and did not result in deficient performance. Dr. Brams testified on Sturm's behalf during the dispositional hearing, during which her 35-page psychological evaluation report on Sturm was admitted into evidence. According to Dr. Brams' report, she interviewed Sturm two weeks prior to trial and during the interview, Sturm essentially confessed again to committing the crimes stating, "I feel bad ... a little ... I knew it was wrong", "I did something wrong andI deserve punishment", and "wish I can take back what I did." Sturm's admissions and statements of "remorse" are inconsistent with and do not support a defense theory that his confession was false and/coerced. While it is unclear the exact role Dr. Brams' evaluation played in trial counsel's determination that Dr. Brams was "not sufficient to do the false confession testimony," given this information, we cannot say that counsel was deficient for failing to search for and obtain yet another false/coerced confessions expert, who likewise may not have been able to support that defense.

Even if we assume that trial counsel's affidavit raises sufficient questions regarding his decision and or motivation for failing to secure a false/coerced confessions expert, Sturm failed to present sufficient credible evidence to establish resulting prejudice. Simply, he failed to present sufficient operative facts to show that his confession was in fact false and/or coerced. He did not present any evidence to show that he has ever recanted his confession. For example, he did not offer his own affidavit indicating that his confession was actually false and/or coerced. Moreover, in her affidavit, Davis merely discussed statistical findings and several "general principles" concerning why suspects confess falsely that were "particularly relevant to this case." However, her affidavit does not indicate what evidence, documents, materials, etc. she reviewed in preparing her affidavit as it relates to this particular case and does not indicate that she personally evaluated or interviewed Sturm. Most importantly, she did not offer a specific expert conclusion regarding Sturm's confession. Similarly, in his

report, Rini described the interrogation methods as "deplorable" and "suspect, at best" and made certain observations about Sturm's interrogation, including the location of the interview, Sturm's lack of representation, the interruptions during the interview, and the detective's lack of specialized training in the interrogation of juvenile suspects. Yet, he failed to offer a specific opinion concerning Sturm's confession. Thus, we conclude that Sturm failed to present sufficient operative facts to warrant a hearing on the issue of whether trial counsel was ineffective for failing to secure a false/coerced confessions expert.

Sturm also contends that trial counsel was ineffective for failing to secure experts in the field of ballistics, crime scene reconstruction, and DNA. We again conclude that Sturm failed to present sufficient operative facts to show deficient performance.

In his affidavit, trial counsel states that his failure to retain a ballistics expert was due to the lack of funding. However, he also states that he "did not believe there was a reason to hire a ballistics expert" because he "assumed that the presumed murder weapon was the weapon involved in the case." We believe that this information suggests that counsel was satisfied with the notion that the alleged murder weapon, i.e., the .410 shotgun, was the actual murder weapon and instead tried to focus on other issues in the case. Thus, we cannot find error in the trial court's conclusion that trial counsel's decision not to retain a ballistics expert was a strategic decision.

Even if the failure to retain a ballistics expert amounted to substandard representation, we find no resulting prejudice. Many of the issues addressed in Nixon's report were introduced through testimony at trial, such as the lack of blood and gunshot residue on Sturm's shirt; the fact that Sturm's confession made no mention of striking his grandmother with blunt force to the head; the fact that Sturm's confession implied shooting the victims at a distance rather than inflicting a contact wound as shown by the physical evidence; the lack of the victims' blood and/or tissue on the gun; and the lack of Sturm's fingerprints on the gun. Furthermore, Sturm's counsel argued many of these points during his closing argument.

Similarly, Sturm failed to show resulting prejudice concerning trial counsel's failure to hire a crime scene reconstructionalist and a DNA expert. Rini's report essentially sets forth the facts presented during the trial, i.e., that there was no physical evidence linking Sturm to the murders; that investigators overlooked potential evidence at the scene such as footprints and bloody shoes owned by the grandmother's

fiancé; the lack of investigation to narrow the time of death; the lack of gunshot residue; and the lack of blood on Sturm's clothing and/or the alleged murder weapon. Again, most of these facts were presented via testimony during trial and vigorously argued by Sturm's counsel during closing argument.

Furthermore, as Sturm correctly points out, his confession was the centerpiece of the State's case. In his direct appeal, we concluded that the State presented substantial evidence upon which a rational trier of fact could reasonably conclude that Sturm was delinquent beyond a reasonable doubt. In so doing, we commented on Sturm's confession:

Sturm's confession placed him inside the victims' home at the time of the murders. He confessed to shooting both his aunt and grandmother, and he knew facts and details that only the shooter could know. For example, Sturm knew the location of the victims' fatal wounds and what they were doing when they died. Furthermore, Sturm knew that three .410 slugs had been fired from a .410 shotgun, and he knew the location of the spent shell casings. Sturm also admitted that he unscrewed the hinges of the gun cabinet in order to take possession of the murder weapon, which is consistent with the investigation at the scene.

Additionally, Sturm admitted taking actions to destroy forensic evidence that might have been used against him by washing his pants and showering to eliminate any gunshot residue. This evidence negates Sturm's assertion that the evidence is deficient because none of the forensic scientists at the Ohio Bureau of Criminal Investigation were able to find any gunshot residue or DNA linking Sturm to the crime.

Sturm's behavior immediately following the shooting is also consistent with guilt. He fled the crime scene and ran along a trail without a shirt for approximately two and one-half miles. He eventually came to a road and asked Rodney West, a passing motorist, to give him a ride to a location other than his home. West testified that Sturm appeared "scared to death."

As we have already determined, Sturm failed to present substantial credible evidence to demonstrate that trial counsel was ineffective for failing to secure a false/coerced confessions expert, i.e., he failed to show deficient performance or resulting prejudice. Given his

confession, as well as the other evidence presented at trial, we simply cannot conclude that trial counsel's failure to call experts in the field of ballistics, crime scene reconstruction, and DNA resulted in prejudice. As we noted in his direct appeal, Sturm attempted to minimize his culpability in the crimes in his confession by claiming they were accidental, a notion first advanced by the detective who interviewed Sturm. And though there were "minor factual inconsistencies" between his confession and the evidence found at the scene, they were not so inconsistent as to render his confession "unreliable" as a matter of law. To the contrary, the confession was powerful and damaging evidence against Sturm, despite the fact that it did not "exactly mirror" the evidence. Thus, in light of his confession, we simply cannot conclude that the issues raised by these other experts demonstrate a sufficient showing of resulting prejudice.

. . . Accordingly, we overrule his sole assignment of error.

*In re B.C.S.*, 2008 WL 4823572, at *9-15.

The right to counsel guaranteed by the Sixth Amendment is the right to effective assistance of counsel. *McMann v. Richardson,* 397 U.S. 759, 771 n. 14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington,* 466 U.S. at 687; *see also Blackburn v. Foltz*, 828 F.2d 1177 (6th Cir.1987). "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland,* 466 U.S. at 689.

To establish prejudice, it must be shown that there is a reasonable probability that, but for counsel's errors, the result fo the proceedings would have been different. *Id*. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 697. Because petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, if the Magistrate Judge determines that petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

Petitioner argues that the state appellate court misapplied and unreasonably applied Strickland in rejecting his claim of ineffective assistance of counsel. Petitioner again argues that, in view of the discrepancies between his confession and evidence presented at trial, and because there was no physical evidence connecting him to the crimes, he was prejudiced by defense counsel's failure to present or consult with expert witnesses on his behalf. He complains that the state appellate court improperly concluded that defense counsel's affidavit – indicating the failure to do so did not constitute trial strategy, but was due to the inability to obtain funds – was incredible.

Upon review of the record, the Magistrate Judge is not persuaded by these arguments. For the reasons detailed by the state appellate court, the Magistrate Judge agrees Petitioner has failed to establish he was prejudiced, as that term is defined under *Strickland*, by his attorney's failure to consult with or obtain expert witnesses to testify on his behalf. The record fails to reflect that testimony of expert witnesses would have assisted Petitioner in view of his confession to police, the lack of any indication that he falsely confessed, and the lack of any evidence indicating expert testimony would have absolved him of the crimes.

Claim two is without merit.

## CLAIM THREE

In claim three, Petitioner asserts that his sentence under O.R.C. § 2152.13(D)(2)(a)(i), as a serious youthful offender, violated *Blakely*, because the trial court, rather than a jury was required to make certain factual findings before imposing sentence under this statute. The state appellate court rejected this claim as follows:

> Sturm contends that Ohio's serious youthful offender law violates a juvenile's right to due process as guaranteed by the federal and Ohio Constitutions. We conclude that Ohio's serious youthful offender law is constitutional because it does not target very young offenders nor does it impermissibly treat juveniles as adults. It reserves adult punishment for serious offenders who are not capable of rehabilitation within the juvenile system. Only after a juvenile is at least 14 years-old and has engaged in further serious wrong doing can the court impose the adult sentence.
>
> ***
>
> Sturm argues that Ohio's serious youthful offender statute is unconstitutional based on the United States Supreme Court's holdings in *Apprendi v. New Jersey* (2000), 530 U.S. 466, 120 S.Ct. 2348, and *Blakely v. Washington* (2004), 542 U.S. 296, 124 S.Ct. 2538 as interpreted by *State v. Foster,* supra. In *Foster,* the Court deemed certain provisions of R.C. 2929.14 unconstitutional because they required judicial fact-finding before the imposition of consecutive sentences or a sentence greater than the maximum term authorized by a jury verdict or admission by the defendant. Sturm contends that the reasoning in *Foster* should be applied to Ohio's discretionary youthful offender statute. He argues Ohio's discretionary youthful offender statute is unconstitutional because it compels the juvenile court, and not the jury, to make the specific findings found in R.C. 2152.13(D)(2)(a)(i) before it can impose a serious youthful offender sentence.
>
> This same argument was considered in *In re J.B.,* Butler App. No. CA 2004-09-226, 2005 WL 3610482, which was decided after *Blakely* but before *Foster.* The court in *In re J.B.* reasoned:
>
> > [a]ppellant's right to a jury trial was not violated due to the juvenile court judge making the finding in R.C.

2152.13(D)(2)(a)(i). The sentence appellant received was derived from the jury's verdict on the murder and child endangering counts, not from any additional fact finding engaged in by the juvenile court. Pursuant to R.C. 2152.11(B)(2) and R.C. 2152.11(E)(2), appellant was subject to a serious youthful offender disposition at the discretion of the juvenile court simply by virtue of the delinquency finding for murder and child endangerment. Therefore, the range of appellant's potential punishment by virtue of the jury verdict alone included the applicable adult punishment set forth in Revised Code Chapter 2929. In making the finding in R.C. 2152.13(D)(2)(a)(i), the court was determining appellant's punishment within the statutorily prescribed range, taking into account the nature and circumstances of the offense, and the security, programming, and resources available in the juvenile system. The court's consideration of those matters did not violate appellant's right to a jury trial. See *State v. Combs,* Butler App. No. CA2000-03-47, 2005-Ohio-1923, ¶ 59, and *State v. Farley,* Butler App. No. CA2004-04-085, 2005-Ohio-2367, ¶ 42 (consideration of discretionary sentencing factors by judge did not violate offender's right to jury trial where sentence imposed was within statutorily defined range for offense).

*Id*. at paragraph 126.

We find the reasoning in *In re J.B.* persuasive and adopt it here. Once the jury found Sturm guilty of murder, he was automatically subject to a blended sentence. The juvenile court's findings in R.C. 2152.13(D)(2)(a)(i) are merely discretionary sentencing factors to be applied to the range of punishment that was solely determined by the jury's verdict. Accordingly, we conclude that Ohio's serious youthful offender statute is not unconstitutional because the range of Sturm's punishment was determined by the jury's verdict.

*In re Sturm*, 2006 WL 3861074, at *1-18. Again, the Magistrate Judge is not persuaded that Petitioner has established this claim warrants federal habeas corpus relief.

In *Bucio v. Sutherland*, 674 F.Supp.2d 882, 946-47 (S.D. Ohio 2009), the United States District Court for the Southern District of Ohio, Western Division rejected this same argument, finding the reasoning in the Ohio Supreme Court's decision in *State v. D.H.*, 120 Ohio St.3d 540 (2009)(rejecting *Blakely* challenge to Ohio's serious youthful offender statute) to be persuasive:

> [P]etitioner had no Sixth Amendment right to a jury trial in his juvenile court proceeding. *McKeiver,* 403 U.S. at 545, 91 S.Ct. 1976. While petitioner exercised his statutory right to a jury trial under Ohio law, the jury made the critical factual findings which ultimately exposed petitioner to a potential blended sentence. These findings included his age at the time of the offense and that he committed the acts supporting a guilty finding on the murder and child endangerment charges. *See* Ohio Rev.Code §§ 2152.11(B)(2), (E)(2). Once the jury determined petitioner was guilty of murder and child endangerment, he was then eligible for a discretionary serious youthful offender disposition, *i.e.,* a range of punishment solely determined by the jury's verdict. In other words, "the jury's finding beyond a reasonable doubt that a child committed the offenses that form the foundation permitting the court to sentence the child as an adult" satisfies the constitutional concerns expressed in *Apprendi* and *Blakely.* State v. Gonzales, 130 N.M. 341, 349, 24 P.3d 776, 784 (N.M.App.2001). The juvenile court judge's findings under § 2152.13(D)(2)(a)(i) were based on discretionary factors wholly appropriate to and within the expertise of the judge—the strengths and weaknesses of the available facilities and programs within the juvenile system as well as the prospect of such resources in meeting the rehabilitative goals of the juvenile justice system for this particular juvenile offender. These predictive factors are distinct from the findings of historical facts traditionally made by juries in the sentencing of adult defendants as in *Apprendi* and *Blakely. See Gonzales v. Tafoya,* 515 F.3d 1097, 1112–14 (10th Cir.), *cert. denied,* —— U.S. ——, 129 S.Ct. 211, 172 L.Ed.2d 156 (2008). The juvenile court's exercise of its discretion in light of these factors in crafting a blended sentence to best meet the needs of this particular juvenile offender does not violate petitioner's right to a jury trial.

Id.  See also State v. Andrews, 329 S.W.3d 369, 374-75 (Mo. 2010)(noting that "courts in every jurisdiction that have juvenile-certification statutes. . .  have concluded that *Apprendi*'s rule does not

apply to juvenile transfer or certification proceedings and that there is no constitutional right to a jury determination respecting the transfer of a juvenile's case to a court of general jurisdiction"); *Morales v. United States*, No. 09CIV5080, 2010 WL 3431650, at *7, n.7 (S.D.N.Y. Aug. 31, 2010)(noting that the majority of courts to consider the issue have rejected the argument that use of non-jury juvenile adjudications to enhance a sentence violates *Apprendi*). The Magistrate Judge agrees with the reasoning of those courts.

Claim three is without merit.

**WHEREUPON,** The Magistrate Judge **RECOMMENDS** that Petitioner's claims be **DISMISSED.**

### PROCEDURE ON OBJECTIONS

If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court

adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

s/Mark R. Abel

United States Magistrate Judge